## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MARÍA DEL CARMEN COTTO ARROYO, as Executor of the Estate of LUIS COTTO-ROMÁN, Deceased, and on behalf of the statutory beneficiaries, ISABEL ARROYO VIERA, Widow of Luis Cotto-Román, individually and as statutory beneficiary, UNKNOWN PLAINTIFFS.<br><br>PLAINTIFFS<br><br>VS<br>UNITED STATES OF AMERICA, VA CARIBBEAN HEALTHCARE SYSTEM, an operating division of the United States Department of Veterans Affairs, UNKOWN DEFENDANTS, UNKNOWN INSURANCE AGENCIES.<br><br>DEFENDANTS | CIVIL NO.<br><br>COMPLAINT FOR:<br>U.S. CONSTITUTIONAL AND CIVIL RIGHTS CLAIMS (DUE PROCESS, EQUAL PROTECTION, AND RIGHTS UNDER 42 U.S.C. § 1983 AND § 1981; 41705; THE AMERICANS WITH DISABILITIES ACT (ADA), 42 U.S.C. § 12101 ET SEQ.; CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981; CIVIL RIGHTS ACT OF 1871, 42 U.S.C. § 1983; BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH; NEGLIGENCE AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS; FEDERAL RULE OF CIVIL PROCEDURE 23(B)(2) AND (B)(3); COMPLAINT FOR DAMAGES, FEDERAL TORT CLAIMS ACT – MEDICAL MALPRACTICE AND WRONGFUL DEATH, SUPLEMENTAL JURISDICTION.<br><br>(DEMAND FOR JURY TRIAL) |

## COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**NOW COMES THE PLAINTIFFS and prays as follow.**

### I.    INTRODUCTION

1.      This is a civil action arising from the death of Luis Cotto-Román, a retired United States Army soldier and eligible VA patient, who died while hospitalized at the VA Caribbean Healthcare System as a direct and proximate result of systemic medical negligence, failure to accommodate disability, and unconstitutional deprivation of life and liberty interests. This action is brought pursuant to the Federal Tort Claims Act ("FTCA"), together with alternative and supplemental claims for declaratory and injunctive relief under the United States Constitution, federal civil rights statutes, the Americans with Disabilities Act, the Rehabilitation Act, and Puerto Rico law.

## II.    JURISDICTION AND VENUE

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346(b)(1). This Court further exercises supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all related claims arising under Puerto Rico law. Venue is proper in this District under 28 U.S.C. § 1402(b).

3.      All administrative prerequisites under 28 U.S.C. § 2675(a) have been satisfied. Plaintiffs timely presented an administrative tort claim to the Department of Veterans Affairs, which was received by the agency on or before September 3, 2024, and more than six months elapsed without final agency disposition prior to filing this action.

4.      Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343, as this action arises under the Constitution and laws of the United States.

5.      The Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims asserted herein occurred in this district, and Plaintiffs dealt with Defendants, which are located in and/or do business in this district. Venue is proper pursuant to 28 U.S.C. § 1391(c) because Defendants conduct substantial business in this District, have sufficient minimum contacts with this District, and otherwise purposely avails themselves of the markets in this District, through the promotion, sale, and marketing of their services in this District.

7.      Plaintiffs also seek supplemental jurisdiction on state law claims under Article 1536 of the Commonwealth of Puerto Rico Civil Code, Puerto Rico Laws Annotated, Title 31, Section 10801.

## III.    PARTIES

8.      Plaintiffs are residents of Puerto Rico and the United States of America.

9.      Plaintiff María del Carmen Cotto Arroyo is the duly appointed Executor of the Estate of Luis Cotto-Román pursuant to a valid Military Last Will and brings this action on behalf of the Estate. Plaintiff Isabel Arroyo Viera is the lawful widow of the Decedent and brings this action in her individual capacity as a statutory beneficiary, seeking recovery for her own damages, including mental anguish and loss of consortium.

10.    Defendant United States of America is liable under the FTCA for the acts and omissions of its employees acting within the scope of federal employment.

11.    Defendant VA Caribbean Healthcare System is a federal healthcare facility operated by the United States Department of Veterans Affairs and is named for purposes of factual attribution and declaratory and injunctive relief.

12.    The term 'Unknown Plaintiff' includes any person who may be affected by or involved in the allegations contained in this complaint.

13.    Unknown Defendants and Unknown Insurance Agencies are any persons that can be liable for the actions alleged in this Class Action Complaint.

## IV.    NATURE OF THE ACTION

14.    Plaintiffs assert claims under the Federal Tort Claims Act; the United States Constitution and federal civil rights statutes; the Americans with Disabilities Act and the Rehabilitation Act; breach of contract and breach of the implied covenant of good faith and fair dealing; negligence; wrongful death; and supplemental jurisdiction pursuant to 28 U.S.C. § 1367."

## V.    FACTUAL ALLEGATIONS

15.    This is a civil action for medical malpractice and wrongful death brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671–2680, arising from the negligent acts and omissions of employees, agents, and medical personnel of the VA Caribbean Healthcare System, acting within the scope of their federal employment. As a direct and proximate result of said negligence, Luis Cotto-Román, a retired United States Army soldier and eligible VA patient, suffered a preventable fall while hospitalized, sustained catastrophic internal injuries, and died during the same admission.

16.    This Court has exclusive subject matter jurisdiction pursuant to 28 U.S.C. § 1346(b)(1). Venue is proper in the District of Puerto Rico under 28 U.S.C. § 1402(b) because the acts and omissions giving rise to this action occurred in Puerto Rico. All administrative prerequisites under 28 U.S.C. § 2675(a) have been satisfied, as Plaintiffs timely presented an administrative tort claim to the Department of Veterans Affairs, which was received by the agency no later than September 3, 2024, and more than six months have elapsed without final disposition.

17.    Plaintiff María del Carmen Cotto Arroyo is the duly appointed Executor of the Estate of Luis

Cotto-Román pursuant to a valid Military Last Will and brings this action on behalf of the Estate.

18.    Plaintiff Isabel Arroyo Viera is the lawful widow of Luis Cotto-Román and brings this action in her individual capacity as a statutory beneficiary under Puerto Rico law, seeking recovery for her own damages, including mental anguish and loss of consortium.

19.    Luis Cotto-Román was a resident of Puerto Rico, a retired United States Army soldier, and an eligible patient of the Veterans Administration. Defendant United States of America is liable under the FTCA for the negligent acts and omissions of its employees acting within the scope of their federal employment. Defendant VA Caribbean Healthcare System is a federal healthcare facility operated by the United States Department of Veterans Affairs and is included herein for purposes of declaratory relief, factual attribution, and injunctive considerations, as applicable.

20.    On January 8, 2024, Luis Cotto-Román presented to the VA Caribbean Healthcare System Emergency Department with respiratory distress. He was admitted, transferred to the Intensive Care Unit, and subsequently downgraded to medical floors due to documented clinical improvement.

21.    Nursing records reflected that, as of January 21, 2024, Mr. Cotto-Román had a Morse Fall Scale score of 60, classifying him as a high-risk fall patient requiring enhanced fall-prevention measures.

22.    Despite this classification, on January 22, 2024, Mr. Cotto-Román was left unattended without a sitter or adequate fall-prevention safeguards.

23.    At approximately 2:30 p.m., Plaintiffs arrived at his hospital room and found him lying on the floor, gasping for air and complaining of severe abdominal and leg pain after having fallen from a hospital bed approximately four feet high.

24.    Nursing staff responded belatedly and improperly moved the patient without spinal precautions, initially placing him face-down and further aggravating his condition.

25.    Following the fall, Mr. Cotto-Román experienced a significant clinical deterioration. He was later diagnosed with intestinal perforation consistent with traumatic injury.

26.    On January 26, 2024, he died while still hospitalized at the VA Caribbean Healthcare System.

27.    Treating physician Dr. José A. Espinal-San Miguel later acknowledged that the fall could not be ruled out and was more likely than not the precipitating cause of death.

28.    The incident constituted a preventable "Never Event" and Sentinel Event under CMS and Joint Commission standards and reflects a gross failure of patient safety protocols.

29.    Defendants breached the applicable standard of care by failing to implement mandatory fall-prevention measures, leaving a high-risk patient unattended, improperly handling the patient after the fall, failing to timely diagnose and treat traumatic internal injuries, and failing to supervise and train personnel adequately.

30.    As a direct and proximate result of Defendants' negligence, Mr. Cotto-Román suffered conscious pain and suffering and ultimately death.

31.    Plaintiffs seek compensatory damages under the Federal Tort Claims Act and Article 1536 of the Puerto Rico Civil Code, including damages for pain and suffering, loss of life, funeral and medical expenses, and the mental anguish suffered by Plaintiff Isabel Arroyo Viera and each of the individuals and statutory beneficiaries.

32.    On Jan 8, 2024 at 2335hrs, Maria del Carmen Cotto (Daughter) and wife Isabel Arroyo arrived at the San Juan VA Emergency Department with Mr. Luis Cotto-Roman, who was complaining of difficulty breathing as stated on medical records. Please See Medical records.

33.    On Jan 9, 2024 at 0300hrs, Mr. Luis Cotto-Roman (our father) was transferred to the VA Intensive Care Unit (ICU) due to improvement as stated on page(s) 1001. Id.

34.    On Jan 11, 2024, Mr. Luis Cotto-Roman was transferred from ICU to the acute ICU floor unit/ward as stated on medical records due to continued improvement. Id.

35.    On Jan 12, 2024, Mr. Luis Cotto-Roman was transferred from to acute ICU to med floor. Id.

36.    On Jan 14, 2024, Mr. Luis Cotto-Roman was transferred to 4K unit where then he passed away due to internal injuries (intestinal perforation) due to the fall and as a direct result of hospital negligence and failure to follow standard of care procedures for a high risk of fall patient resulting in wrongful death. Id.

37.    Following dates focus on the days prior to fall and care after fall where the wrongful death and medical malpractice occurred:

38.    On Jan 21, 2024, 1258hrs, Dr. Jose A. Espinal-San Miguel (On-call physician) medical

assessment record relevant entry stated, Id, "Patient continues clinically stable without shortness of Breath (SOB) and speaking full sentences on evaluation, will discharge upon equipment arrival."  Our family was only waiting for the VA to deliver a medical style bed to the house so Mr. Cotto could be sent home due to his continual improvement as described by the VA physicians. Id.

39.    On Jan 21, 2024, 1831hrs, Mr. Robert Jimenez, RN, nursing in-patient note, shift change assessment, relevant entry stated Id, "the Morse Fall Scale was performed and score was 60. This is indicative of high risk for fall." According to Ref 1 below, an MFS score equal to or greater than 51, requires that the attending medical staff, "Implement High Risk Fall Prevention Interventions." Morse Fall Scale (MFS) adapted SAGE publication indicating MFS score ranges. Id.

40.    On Jan 22, 2024 at 0215, Laboratory results included in progress report noticed lower PLT score than prior days, relevancy, compare this score to days after the fall (22 Jan 2024/noon). Id.

41.    On Jan 22, 2024, on or about 1430-1500hrs Maria del Carmen Cotto (daughter) and Isabel Arroyo (Spouse) arrived at the San Juan Veterans Administration Hospital in line with their daily routine to visit the patient/Veteran/Father/Husband. SFC (R) Luis Cotto-Roman was located on the fourth (4th) floor room 4489K. Upon arrival to the hospital room, they found their loved one (Mr. Cotto) on the hard/cold tile hospital floor, where they immediately concluded that he had fallen from the hospital bed. They observed that he was gasping for air with his head positioned in an upward oriented manner looking up toward the ceiling flat on his back and complaining of severe abdominal and leg pain as a direct result of the fall. As a result of this incredibly hard fall from the bed about 4 feet from the floor he had punctured his intestines and was slowly dying as a direct result. Maria del Carmen Cotto's (daughter) actions after finding our father on the hard marble floor of his hospital room:

a.    She quickly assessed the situation and told her mother (Isabel) to stay with Dad while she ran to get help from the nurse station located at the center of the hospital ward. She was panicked, dismayed, and shocked but determined to get their father immediate medical assistance. She requested immediate assistance from the multiple nurses located at the nurse station. She explained that her father had fallen from the bed (which was about four (4) feet high) and that he needed immediate medical care. The nurse station personnel seemed to have a laissez-fair attitude and did not react quickly.

b.       Once the nurses finally responded, they inappropriately picked up her father from the hospital floor and placed him face down on the hospital bed. They did not assess him for any neck or spinal injuries prior to moving him to the hospital bed. She quickly told them that they should not have moved him until they assessed his condition in case, he had any spinal or neck injuries. When she made this comment, they seemed flustered and angry.

c.       She asked the nurses that placed him on the hospital bed why they placed her father face down on the bed, as she noticed that he could not breath. She expressed dismay that they should have known that. So, they quickly placed him on his back. Additionally, they did not seem to know how to rotate his torso while they were placing him on his back.

d.       She was incredibly upset and sternly commented to the nurse in charge that she did not understand why they left her father unattended and that he was supposed to have 24/7 observation. The nurse told Maria that she had gone to lunch. Maria questioned why someone didn't replace her in her father's hospital room while she was at lunch. The nurse did not respond and simply walked out.

e.       The doctor arrived in our father's hospital room on/about 1427hrs on Jan 26, 2024. Maria had the presence of mind to video the doctors (Dr. Jose A. Espinal San Miguel) evaluation of our father's condition after the fall. Our father was complaining of leg pain and severe abdominal pain. Video of Monday 22 Jan 2024 at 1427 fall Doctor (San Miguel) in bed evaluation from San Juan VA (illustrates height of bed).

42.       On Jan 22, 2024, 1546hrs, Ms. Jessenia Rio-Nevarez, RN, nursing in-patient treatment plan interdisciplinary, relevant entry stated on medical records, header "FOCUSED; PATIENT FELL, predicted outcome/person served goal: "intervention/orders: determine the severity level with the physician. Obtain and record Vital Signs (VS) (Sitting and standing if possible). This entry is important because it documents the post incident (fall) actions after the day he fell including the planned care for the patient.

43.       On Jan 26, 2024, 1500hrs, Dr. Marrero called Maria del Carmen Cotto to inform her that Luis Cotto-Roman had gotten worse and kept going backwards. When Maria del Carmen Cotto and Isabel Arroyo arrived at the VA Hospital around 1510 hours. Dr. Marrero walked up to them at the front

counter and the ward and told them that Mr. Luis Cotto-Roman's condition worsened and that he had

passed away.

44.     On Jan 26, 2024, Discharge Summary (REF 4), comments on Intestinal perforation are pointed

out by Dr. San Miguel-Espinal.

45.     On Jan 27-28, 2024 (weekend), Our mother (spouse), Maria del Carmen Cotto, and Luis Cotto-

Arroyo (son) had been directed by medical staff to talk to the VA Hospital Patient Liaison personnel

located at an annex adjacent to the main entrance of the VA hospital to seek assistance.

46.     On Saturday, Jan 27, 2024, they spoke with Mr. Javier Navarro who provided information about

requesting an autopsy. The information was not factual, so the documents he had us sign were incorrect.

We returned the next day to the Patient Liaison office and spoke with Ms. Veronica Martinez who told

us that the procedures for the autopsy and that the person in charge at Exequias would be better

positioned to inform us.

47.     On Jan 28, 2024, Luis Cotto-Arroyo (son), Maria del Carmen Cotto (daughter), Robin Walker

(son in law) and Lucy Walker (Daughter and RN) went to the VA hospital to speak with the on-call

physician (Dr. San Miguel-Espinal) who was working and caring for our father the day he passed away.

We spoke to Dr. Espinal about the circumstances surrounding the fall. Dr Espinal told us that he could

not definitively rule out that the fall was what precipitated the patient's death and more than likely it

was the cause of his death due to the perforated intestine. It was at this time that they discovered for the

first time that Dr. San Miguel-Espinal had also requested an autopsy for our father.

48.     On Jan 29, 2024, Luis Cotto-Arroyo and Isabel Arroyo went to the VA patient care Exequias

Office located in room 1E 109 to speak with the POC Lisette. We explained to Lisette what we were

told by the patient advocate personnel on call over the weekend (both Javier Navarro and Veronica

Martinez) about the Veterans Hospital spouse/next of kin information process. In particular, how they

had advised us about requesting an autopsy. Lisette told us that what Mr. Navarro and Ms. Martinez

told us over the weekend was not entirely correct. She went on to explain to us what was supposed to

happen regarding the autopsy. Lisette told us that the VA hospital on-call surgeon's (Dr. San Miguel-

Espinal) decision to request the autopsy was not in line with the hospital protocol nor the "ciencias

forenses" guidance when someone dies under suspicious circumstances, as we explained the circumstances around our father's fall.  We also explained how we discovered on Sunday Jan 28, 2024 that the on-call physician (Dr. San Miguel-Espinal) had requested an autopsy. Lisette informed us that is not how the process is supposed to work.  She immediately got on the phone and called "ciencias forenses" (State Pathologist office) and spoke to the state pathologist who stated to her that Dr. San-Miguel Espinal had not provided the correct form for the autopsy and that it was "ciencias forenses" that would make the call on the type and location of the autopsy especially under the circumstances (linked to the fall). Later in the day Lissette called us/family to let us know that the "ciencias forenses" (State Pathologist) would be the ones conducting the autopsy.

49.     On Jan 29, 2024, the funeral home was responsible for moving our fathers remains from the VA hospital morgue to the "ciencias forenses" facility for the autopsy. We coordinated with Lisette.

50.     On Feb 2, 2024, Luis Cotto-Arroyo and Maria del Carmen Cotto went to the "ciencias forenses" to conduct an interview based of the circumstances leading to our father's death and were told that either that afternoon or the following day an autopsy would be performed.

51.     On Feb 2, 2024, late afternoon, the VA pathologist (not the state pathologist) told us (they called my sister Maria del Carmen Cotto) that the state "ciencias forenses" would not be conducting the autopsy after all. This struck us as odd because we didn't understand why the state pathologist did not call us to tell us that they had changed their mind. Especially, after they had told us that they would make the decision on who would conduct the autopsy earlier in the week and that morning (Feb 2, 2024) told Maria del Carmen Cotto and Luis Cotto-Arroyo that they would in fact be conducting the autopsy. It is important to note that based on information provided by key the VA and "ciencias forenses", family members had been gathering from across the continental US for the impending burial services. Was also frustrating to the family because we were going on the second week of our father's death and we felt that we needed to bury our father soon.

52.     On Feb 3-5, 2024, we attempted to hire a pathologist to conduct a private autopsy but we were confronted with excuses by the two pathologist the funeral home director recommended.

53.     On Feb 5, 2024, we decided we could not wait any longer and decided to provide our father with

the dignified veterans funeral he deserved.

54.     On 22 January 2024, on or about 1200 hrs (noon) Maria del Carmen Cotto arrived at the San Juan Veterans Administration Hospital with her mother (Isabel Arroyo Viera) to visit her father SFC (R) Luis Cotto-Roman located on the fourth (4th) floor room 4489K. SFC Cotto was admitted to the ICU at the San Juan VA hospital on Sunday 7 January 2024, and 10 days later was sent to a recovery unit where he was pending release on or about 24 January 2024.

55.     The following statements are Maria del Carmen Cotto-Arroyo firsthand accounts from the moment she entered her father's room and observed that he had fallen from the hospital bed on to the floor on 22 January 2024:

36.     Upon arrival to the hospital room on the 4th floor, She found her father on the hard hospital floor, where She immediately concluded that he had fallen from the hospital bed. She observed that he was gasping for air with his head positioned in a manner that he was looking at the ceiling and he was complaining of abdominal and leg pain.

37.     She quickly assessed the situation and told her mother (Isabel) to stay with Dad while She ran to get help from the nurse station located at the center of the hospital ward. She was panicked, dismayed, shocked. She requested immediate assistance from the multiple nurses located at the nurse station. She explained that her father had fallen from the bed (which was about four (4) feet high) and that he needed immediate medical care. The nurse station personnel seemed to have a laze fair attitude and did not react quickly.

38.     Once the nurses finally responded, they inappropriately picked up her father from the hospital floor, placed him face down on the hospital bed, they did not assess him for any neck nor spine injuries prior to moving him to the hospital bed. She quickly told them that they should not have moved him until they assessed his condition in case, he had any spinal or neck injuries. When She made this comment, they seemed flustered.

39.     She told the nurses that placed him on the hospital bed why did they place her father face down on the bed, that he could not breath, and that they should have known that, and so they quickly placed him on his back. Additionally, they did not seem to know how to rotate his torso while they were placing

him on his back.

40.    She was incredibly upset and sternly commented to the nurse in charge that She did not understand why they left her father unattended. The nurse told her that she went to lunch. She told her that that was fine, but she needed to have someone replace her in her father's hospital room while she was eating. The nurse did not respond and simply walked out.

41.    Once the doctor got to her father's hospital room, she did have the presence of mind to video the doctors (Dr. Jose A. Espinal San Miguel) evaluation of her father's condition.

42.    The following statements are from Luz Celeste Cotto-Arroyo: I am writing to share a deeply concerning incident that occurred at the VA Hospital involving my father, Luis Cotto Roman, which ultimately led to his untimely passing on January 2024. As a nurse executive, I feel compelled to address the serious regulatory violations and patient safety issues that were evident in this tragic event.

43.    My father, Luis Cotto-Roman, was identified as "High Risk for Falls" during his time at the VA Hospital due to his confusion and history of steady gait from previous strokes. He was assigned a bedside sitter for close monitoring to prevent falls while in the medical unit. However, on the day of the incident, the sitter left him unattended to go on a break, leading to my father falling to the floor. He was found by my mother and sister in a distressful state, which ultimately resulted in a rapid deterioration of his condition, leading to his passing during the same admission.

44.    This incident raises significant concerns regarding patient safety, quality of care, and regulatory compliance. As a nurse executive, I am well aware of the concept of "Never Events" as defined by the Centers for Medicare & Medicaid Services (CMS). According to the current national quality forum lists of "Never Events" under appendix 2, Environmental Events, patient death associated with a fall while being cared for in a healthcare facility is considered a "Never Event." Additionally, patient death or serious disability associated with the use of restraints or bedrails while being cared for in a healthcare facility also falls under the category of "Never Events."

45.    Furthermore, the Joint Commission describes Sentinel Events as incidents that result in death or serious harm to a patient. Specifically, falls in a staffed-around-the-clock care setting are considered Sentinel Events by the Joint Commission. The failure to prevent my father's fall while under the care of

the hospital's staff constitutes a grave violation of patient safety protocols and regulatory standards.

46.     This heartbreaking incident not only led to the premature loss of my father but also deprived him of his wish to spend his final moments at home surrounded by his family. I urge VA CARIBBEAN HEALTHCARE SYSTEM to thoroughly investigate this matter, address the systemic failures that contributed to this tragic event, and implement necessary measures to prevent such incidents from occurring in the future. My mother and siblings have sought psychiatric counseling to aid in our trauma and grief. My mother and sister are traumatized from finding him on the hospital floor and the nurses lack urgency or compassion when they sought assistance to stabilize him. My mothers' screams are etched in my memory as she repetitively screamed "they killed!!!" every few minutes for days. I can't get her screaming out of my mind.

47.     Isabel Arroyo-Viera statement of facts (wife of Veteran, Luis Cotto-Roman Regarding SFC (R) Cotto-Roman's fall and later death at the San Juan Veterans Hospital.

48.     On 22 January 2024, on or about 1200 hrs (noon) I arrived at the San Juan Veterans Administration Hospital with my daughter Maria del Carmen to visit my husband SFC (R) Luis Cotto-Roman located on the fourth (4th) floor room 4489K. SFC Cotto was admitted to the ICU at the San Juan VA hospital on Sunday 7 January 2024, and 10 days later was sent to a recovery unit where he was pending release on or about 24 January 2024.

49.     The following statements are the firsthand accounts of Isabel Arroyo-Viera from the moment She entered to her husband's room and observed that he had fallen from the hospital bed on to the floor on 22 January 2024:

50.     Upon arrival to the hospital room on the 4th floor, we found my husband alone on the floor of his hospital room. He was gasping for air with his head back. He was in obvious pain. My daughter ran to get help from a nurse. I was nervous and shocked because he was set to come home. I didn't expect to see him this way. Finally, Maria (My daughter) came back to the room with help. The next thing I saw was a nurse putting him back in bed. I remember being upset because they were not gentle with him. They just sort of dropped him face down on the bed. I was honestly angry because it seemed like they were inconvenienced. My daughter told them they should not have moved him until they assessed

him for injuries. Honestly, I was more concerned about my husband's well-being, but I did not feel like anyone was really trying to help him. Instead, I remember people just making excuses about what they were doing.

51.     I don't know how or why my husband fell. I just know he was supposed to come home. The doctor's said he could go as soon as a bed arrived. He was so excited to go home. I had been taking care of him for nine months after he suffered a stroke last April. He had been taken out of Hospice because he was doing so well.

52.     My husband and I met over sixty years ago in Juncos PR. We didn't come from much, but we built a good life together. We got married and had four children. We struggled at first, but Luis worked hard and sacrificed to provide for his family. He put on the uniform and went to war. He worked at the Post Office and played golf. They called him "cuerpo de joven pero cara de viejo."

53.     I know my husband had health problems. Most of them came from his military service. It's okay. I was not blind to his health. I wanted to take care of him. We were a team. We took care of each other all our lives. I expected to have more time. There would have been more time.

54.     I do have nightmares, and I have racing thoughts every day all day. I cannot get the image of Luis on the floor. Luis being plopped face down on the hospital bed like a rag doll. We were told so many different things at the hospital. It didn't make sense then and it doesn't make sense now. No one knew my husband better than me. I know he was ready to come home. Then he fell at the hospital. That was the end and nobody has given any consistent or rational reason why his falling didn't change the situation. Nor, has anyone explained a good reason why he fell. There were supposed to be measures to protect him and they weren't there.

55.     I am grateful that we had four smart professional children to help me. But nothing will ever help me overcome the pain of losing half of my life in this way. I can't bear the thought of another wife or husband trusting that their loved one will be treated with the care and dignity they deserve at a veteran's hospital only to find that they weren't.

56.     The following statements are the firsthand accounts of Luis Cotto Arroyo: My father (Luis Cotto-Roman), due to much improved health, was pending release from the Veterans Administration

Hospital in San Juan Puerto Rico on or about the week of the 22d of January 2024 pending the delivery of a hospital bed to our home in Levittown Puerto Rico. Oue to direct gross negligence of the medical staff responsible for his care, by incurring a Seminole moment by failing to provide the standard of care necessary for someone in my father's condition by not providing 24/7 observation of a patient who was high risk for falling. On 22 Jan 2024 at 2:30PM, my sister Maria del Carmen Cotto and my mother Isabel Arroyo-Viera found my father on the floor of the hospital gasping for air and complaining of abdominal and leg pain after having fallen from the bed. 4 days later, my father passed away.

## VI.    CAUSES OF ACTION

COUNT I – Federal Tort Claims Act; Medical Malpractice and Negligence

57.    Defendants breached the applicable standard of care by failing to implement mandatory fall-prevention measures, leaving a high-risk patient unattended, improperly handling the patient after the fall, and failing to timely diagnose and treat traumatic internal injuries. These acts and omissions directly caused the Decedent's pain, suffering, and death, as well as the emotional distress suffered by Plaintiff Isabel Arroyo Viera and each of the individuals and statutory beneficiaries.

COUNT II – Wrongful Death, FTCA and Puerto Rico Law – Supplemental Jurisdiction

58.    Defendants' negligence caused the wrongful death of Luis Cotto-Román, entitling Plaintiffs to damages under Article 1536 of the Puerto Rico Civil Code, exercised through 28 U.S.C. § 1367.

COUNT III – Constitutional Violations, Due Process and Equal Protection – Fifth Amendment

59.    Defendants, acting under color of federal law, deprived the Decedent of substantive and procedural due process and equal protection by subjecting him to arbitrary, unsafe, and discriminatory medical treatment. These claims are brought for declaratory and injunctive relief and are pleaded in the alternative.

COUNT IV – Disability Discrimination, ADA and Rehabilitation Act

60.    The Decedent was a qualified individual with disabilities. Defendants failed to provide reasonable accommodations and adequate monitoring, in violation of Title II of the ADA and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

COUNT V – Civil Rights, 42 U.S.C. §§ 1981 and 1983 – Pleaded in the Alternative

61.    To the extent applicable, Defendants' conduct deprived the Decedent of federally protected rights under §§ 1981 and 1983. These claims are pleaded in the alternative to preserve all constitutional remedies.

COUNT VI – Breach of Contract and Implied Covenant of Good Faith

62.    By accepting the Decedent as a VA patient, Defendants entered into an implied contractual relationship to provide safe and competent medical care, which they breached.

## VII.    DEMAND FOR JURY TRIAL

63.    Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

## VIII.    PRAYER FOR RELIEF

64.    The Plaintiffs respectfully request judgment against Defendants awarding compensatory damages according to proof, declaratory and injunctive relief, costs, interest, and any other relief this Court deems just and proper.

**WHEREFORE,** Plaintiffs, on behalf of themselves and all individuals and statutory beneficiaries, pray for judgment against Defendant as follows:

A.    Actual damages for injuries suffered by Plaintiffs;

B.    An order declaring the alleged acts and practices of Defendants to constitute a breach of contract and a breach of the covenant of good faith and fair dealing;

C.    An order for Defendants' specific performance of its contractual obligations together with other relief required by contract and law;

D.    Reasonable attorneys' fees and the costs of this action;

E.    Statutory pre-judgment interest;

F.    Award Plaintiff damages against all Defendants, jointly and severally, in an amount no less than $15,000,000.00 to be proven at trial together with prejudgment interests, costs and attorney fees.

G.    Such other relief as this Court may deem just and proper.

H.    Defendant's negligence caused the wrongful death of Mr. Cotto-Román.

I.    Plaintiff, on behalf of the Estate and statutory beneficiaries (widow and children), seeks damages for: Conscious pain and suffering; Medical and funeral expenses; Loss of life and enjoyment of life; Mental anguish of statutory beneficiaries,

J.    Plaintiff seeks compensatory damages in excess of $15,000,000, plus costs, interest, and all relief allowed under law.

K.    Enter judgment against Defendant;

L.    Award compensatory damages according to proof;

M.    Award costs and interest; and

N.    Grant any other relief the Court deems just and proper.


**RESPECTFULLY SUMBITTED** this 22 of December, 2025.


*S/Joseph F. Gierbolini,* USDCPR 229014

PO Box 191620 San Juan, PR 00919-1620
787-225-5367, juriszone@capr.org